UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ADEN HUSSEN HASSAN,

                  Petitioner(s),

     v.

TODD BLANCHE, et al.,

                Respondent(s).

CASE NO. C25-2444-KKE

ORDER ON AMENDED HABEAS PETITION

Petitioner is a native and citizen of Somalia who arrived in the United States as a refugee thirty-four years ago, when he was fifteen.  He now suffers from end-stage renal disease and requires uninterrupted dialysis three times a week to survive.  Since being detained by Immigration and Customs Enforcement ("ICE") a year ago, he has visited the emergency room eight times for chest pain, loss of consciousness, or hypertensive emergency.  And his doctors most recently discovered a mass on his kidney they believe may be cancerous.

Although he has lived in the community for decades under an order of supervision ("OSUP"), the Government[1] now intends to place him on a multi-day, international flight to Somalia, during which the Government has not arranged for Petitioner to have access to dialysis or to a healthcare provider in case of emergency or flight delay.  Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241 (Dkt. No. 2) and a subsequent amended petition

_____

[1] This order refers to all Respondents except Bruce Scott collectively as "the Government."

ORDER ON AMENDED HABEAS PETITION - 1

(Dkt. No. 35), contending, among other things, that the inadequacy of the Government's arrangements violates his constitutional rights and that his continued detention is unlawful.

The Court agrees that the Government's plan for Petitioner's removal flight fails to ensure the basic level of safety constitutionally required for a civil detainee in Petitioner's medical state. And because the Government has not shown it can provide a constitutionally adequate flight (or that it has any other valid reason for detaining him), Petitioner's civil detention no longer serves any legitimate, non-punitive purpose. Moreover, Petitioner's detention is unlawful for the additional reason that the Government failed to follow its own regulations or provide otherwise constitutionally adequate process when it revoked his OSUP and re-detained him. Accordingly, the Court will grant Petitioner's habeas petition and order his release.

## I.    BACKGROUND

### A.    Petitioner's History, Removal Proceedings, and Arrest

Petitioner, a native and citizen of Somalia, came to the United States as a refugee in 1992, when he was fifteen years old. Dkt. No. 18 ¶ 4, Dkt. No. 35 at 9. Between 1990 and 1991, Petitioner alleges that combatants in Somalia's civil war destroyed his family's home, shot his father (who survived), injured or killed several other members of his family, and severely burned Petitioner with boiling water. Dkt. No. 35 at 9. When Petitioner was fourteen, his family fled for Ethiopia and then Kenya, where he and over twenty family members were granted refugee status to come to the United States. *Id.*

Within a year of arriving, Petitioner adjusted his status to lawful permanent resident. Dkt. No. 18 ¶ 5. He settled in Rochester, Minnesota, where he lived for over two decades, graduated high school, and—until his arrest by ICE in 2025—worked as an Amazon delivery truck driver. Dkt. No. 35 at 9–10. Between 1996 and 2017, he was convicted of several crimes: assault in the third degree (in 1996); disorderly conduct (in 2000); false imprisonment and terroristic threats (in

ORDER ON AMENDED HABEAS PETITION - 2

2013), and a controlled substance crime (in 2017).  Dkt. No. 18 ¶¶ 6, 9, 20–21.  After his first conviction, immigration officials served Petitioner with a notice to appear, charging him as deportable as a result of the assault conviction.[2]  Dkt. No. 20-1.  In 2001, an immigration judge ("IJ") ordered Petitioner removed "to any country other than Somalia" but granted withholding of removal to that country, finding that his "family was driven out of Somalia as a result of attacks" by clan militias and that "conditions in Somalia" were such that Petitioner would have no "level of security were he to return" there.  Dkt. No. 13-10 at 18–19.  The Government successfully sought to reopen the removal proceedings and terminate the grant of withholding.  Dkt. No. 18 ¶¶ 11–15.  And in 2003, the IJ revised the prior decision, ordered Petitioner removed to Somalia, and denied withholding.  *Id.* ¶ 15; *see also* Dkt. No. 20-3.

The Government then issued Petitioner an OSUP, permitting him to live in the community but requiring him to report regularly to immigration authorities at in-person check-ins.  Dkt. No. 20-4.  During this time, Petitioner developed chronic kidney disease and hypertension, which resulted in incidents of hypertensive emergency, visits to the emergency room, and hospitalization.  Dkt. No. 19 ¶ 7, Dkt. No. 32-1 at 2–5, Dkt. No. 86-2 ¶ 5.  Petitioner remained under supervision for two decades until July 2025, when ICE arrested him after forcibly entering his Minnesota apartment as part of "at-large operations" in the area.  Dkt. No. 20-2 at 3–4.

After his arrest, Petitioner received a notice from ICE revoking his OSUP on the ground that "removal from the U.S. is now significantly likely in the reasonably foreseeable future."  Dkt. No. 74-1 at 2.  The notice also states that Petitioner would "promptly be afforded an informal interview" (as required by 8 C.F.R. § 241.13(i)) at which Petitioner would have "an opportunity

---

[2] The Government initially charged Petitioner as deportable on the ground that he had been convicted of an "aggravated felony" under 8 U.S.C. § 1227(a)(2)(A)(iii).  Dkt. No. 20-1.  It later supplemented its case, charging him as deportable for the additional reason that his conviction constituted a crime of moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(i).  Dkt. No. 18 ¶ 8.  The immigration judge ultimately adopted the latter ground for deportation.  Dkt. No. 13-10 at 14.

ORDER ON AMENDED HABEAS PETITION - 3

to respond to the reasons for the revocation and to provide any evidence to demonstrate that [his] removal is unlikely." *Id.* Petitioner states in a declaration that he did not receive an informal interview until months after his arrest and was not, at any time, given an opportunity to challenge the Government's evidence or submit evidence of his own. Dkt. No. 86-1 ¶¶ 3–4. The Government acknowledges that it possesses no documentation indicating that Petitioner's interview occurred or whether it complied with ICE's regulations. Dkt. No. 72 at 10.

Since his arrest, Petitioner's daughter—a United States citizen—filed an I-130 petition with U.S. Citizenship and Immigration Services, seeking to sponsor Petitioner for permanent residency. Dkt. No. 35 at 3–4. Petitioner has also filed a motion to reopen his removal proceedings, which is currently pending before the Board of Immigration Appeals. *Id.*; Dkt. No. 86-3.

**B.      Petitioner's Medical History**

Petitioner's medical condition deteriorated sharply around the time of his arrest. Dkt. No. 19 ¶ 7, Dkt. No. 86-2 ¶ 5, Dkt. No. 35 at 10. Petitioner had apparently run out of anti-hypertensive medication in the week leading up to his arrest, which "precipitated a hypertensive crisis and acute worsening of his kidney function." Dkt. No. 19 ¶ 7, Dkt. No. 86-2 ¶ 5. Upon arriving at the detention facility, Petitioner was experiencing critically elevated blood pressure and other signs of acute kidney injury. Dkt. No. 19 ¶ 7, Dkt. No. 86-2 ¶ 5. The next day, Petitioner was taken to the emergency room and then admitted to the Mayo Clinic hospital, where his care team worked to stabilize his kidney function. Dkt. No. 18 ¶ 23, Dkt. No. 19 ¶ 7, Dkt. No. 35 at 10. Despite intervention, his condition continued to deteriorate. Dkt. No. 19 ¶ 7, Dkt. No. 86-2 ¶ 5. His providers made the decision to start dialysis, which Petitioner underwent continuously for days before he was stable enough to leave the hospital. Dkt. No. 32-1 at 13–14, Dkt. No. 35 at 10. After nineteen days in the hospital, Petitioner was discharged, returned to ICE custody, and then

ORDER ON AMENDED HABEAS PETITION - 4

transferred to the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.  Dkt. No. 18 ¶¶ 23–24.

During his hospitalization, Petitioner was diagnosed with end-stage renal disease—the most severe stage of kidney disease.  Dk. No. 32-1 at 10, 13; Dkt. No. 86-2 ¶ 5.  Patients with end-stage renal disease have little or no residual kidney function and are therefore dependent on dialysis or a kidney transplant to survive.  Dkt. No. 86-2 at 5.  Consistent with the typical treatment for such patients, Petitioner receives a type of dialysis called "hemodialysis" three times a week—on Tuesdays, Thursdays, and Saturdays.  *Id.*; Dkt. No. 35 at 28, Dkt. No. 19 ¶ 8, 19.

There is no dispute that an interruption in dialysis would put Petitioner at serious risk of injury or death.  Thus, NWIPC's medical director, Dr. Eddie Wang, states that, to travel, Petitioner would require "uninterrupted dialysis" between his departure and arrival.  Dkt. No 19 ¶ 19.  Petitioner also submitted a declaration and medical report by Dr. Anip Bansal, a board-certified nephrologist and associate professor of renal diseases and hypertension, who explains that missing even "a single dialysis treatment can lead to clinical deterioration and death."  Dkt. No. 86-2 at 8; *id.* ¶ 1.  In particular, "missing or delaying" a single session "can lead to fluid overload, dangerous elevations in potassium levels, confusion, heart complications, or death in vulnerable patients."  *Id.* at 8–9.

Since being detained, Petitioner has experienced a number of other health problems as well.  He has been to the emergency room at least seven times (in addition to his first visit) for chest pain, loss of consciousness, and fever and shortness of breath determined to be acute influenza.  Dkt. No. 86-2 at 3–5.  He has also been treated for post-traumatic stress syndrome and arthritis and undergone surgery to install a dialysis port.  *Id.*; Dkt. No 19 ¶¶ 12–13.  Most recently, Petitioner's urologist identified a potentially cancerous mass on Petitioner's left kidney and referred Petitioner for further diagnostics.  Dkt. No. 86-2 at 5.

ORDER ON AMENDED HABEAS PETITION - 5

## C.    Procedural History

In December 2025, Petitioner filed his initial habeas petition.  Dkt. No. 2.  The Government subsequently obtained a travel document from Somalia and notified Petitioner that it intended to remove him to that country "in the near future."  Dkt. No. 10 at 1.  Petitioner moved for a temporary restraining order ("TRO"), seeking, among other things, to enjoin his transfer or removal during the pendency of this habeas case.  Dkt. No. 13.  The Court provisionally—and then, after more briefing, finally—granted the TRO.  Dkt. Nos. 14, 33.  And the Court then extended the emergency relief barring Petitioner's transfer or removal several times to maintain jurisdiction over this case. Dkt. Nos. 42, 48, 49, 56, 61, 66, 71, 75, 77, 83, 84.  The Court also granted Petitioner leave to file an amended habeas petition, adding additional facts about his medical condition and the availability of treatment in Somalia, as well as a new claim under the Fifth and Eighth Amendments.  Dkt. No. 33.  In addition, the Court found good cause to support Petitioner's request for discovery (Dkt. No. 37), granted Petitioner's motion to compel discovery (Dkt. No. 55), reviewed certain records produced by the Government *in camera* (Dkt. No. 70), and ordered that some records be produced unredacted (Dkt. No. 76).

The Government has since obtained a second travel document, after the first expired; but that document has expired as well.  Dkt. No. 73 ¶ 3, Dkt. No. 74-7.  ICE Deportation officer Karl Douglas states that "ICE is in the process of requesting a third travel document from Somalia." Dkt. No. 73 ¶ 3.

The Government has now filed its return to the amended petition (Dkt. No. 72) as well as its return to the original petition (Dkt. No. 17), and Petitioner has filed his traverse to the amended petition (Dkt. No. 86).  Petitioner's amended petition is ripe for the Court's consideration.[3]

---

[3] The parties also filed notices of supplemental authority, which the Court has considered.  Dkt. Nos. 88, 89.

ORDER ON AMENDED HABEAS PETITION - 6

## II.   ANALYSIS

### A.   Legal Authority

To succeed on a habeas petition, a petitioner must show he "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241.  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and … the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  A district court's habeas jurisdiction includes challenges to immigration-related detention.  *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *see also Demore v. Kim*, 538 U.S. 510, 517 (2003).

### B.   Petitioner's Detention Has Become Unconstitutionally Punitive.

Petitioner contends that his intended removal to Somalia on a flight that would endanger his life—without adequate arrangements for continuous dialysis or access to emergency care—violates his constitutional right to due process.  *See* Dkt. No. 35 at 5–6, 28–29, 32; Dkt. No. 86 at 10–16.  And because the record does not reflect any plans by ICE to arrange reasonably safe travel to Somalia, Petitioner's continued detention no longer serves a legitimate, non-punitive purpose.  The Court agrees that Petitioner's detention has become excessive in relation to the Government's non-punitive objectives and thus violates his due process rights.

Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).  Although first articulated in cases involving pretrial detention (*see id.* at 523), the Ninth Circuit and other federal appellate courts have applied this principle consistently to other forms of civil detention, including immigration detention.  *See, e.g., Doe v. Kelly*, 878 F.3d 710, 720–721 (9th Cir. 2017) (holding that district court properly applied *Bell* in finding conditions in immigration detention unconstitutionally punitive); *Amanullah v. Nelson*, 811 F.2d 1, 15 (1st Cir.

1987) (comparing pretrial detainees from *Bell* to immigration detainees); *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 325 (3d Cir. 2020) ("As immigration detainees, Petitioners are entitled to the same due process protections as pretrial detainees."); *Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) ("We consider a person detained for deportation to be the equivalent of a pretrial detainee[.]"); *Dixit v. Fairnot*, No. 23-11436, 2025 WL 1733887, at *5 (11th Cir. June 23, 2025) (per curiam) (evaluating immigration detainee's claim of punitive confinement under *Bell*). This is because, like pretrial detainees, immigration detainees have not been adjudicated guilty of a punishable crime "in accordance with due process of law." *Bell*, 441 U.S. at 535–36; *see also Wong Wing v. United States*, 163 U.S. 228, 235–37 (1896) (holding that "imprisonment at hard labor" of noncitizens subject to deportation "without a trial by jury" violated due process).

In determining whether a "challenged condition, practice, or policy" of civil detention violates due process, "the dispositive inquiry" is whether the challenged practice "constitutes punishment." *Block v. Rutherford*, 468 U.S. 57, 583 (2015). A practice is "punishment" if it is either "intended to punish" or "excessive in relation to [its non-punitive] purpose"—i.e., if it is "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]" *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004) (alteration in original) (first quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) and then quoting *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)). In this context, "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell*, 441 U.S. at 539 n.20.

Failing to provide minimally adequate medical care can constitute "punishment" for purposes of the due process analysis. Indeed, in the prison context—where detainees have been adjudicated guilty of a crime—officials inflict *cruel and unusual* punishment by knowingly disregarding a detainee's serious medical need. *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th

ORDER ON AMENDED HABEAS PETITION - 8

Cir. 1997)); *see also Calloway v. Contra Costa Cnty. Jail Corr. Officers*, No. C 01-2689 SBA, 2007 WL 134581, at *30 (N.D. Cal. Jan. 16, 2007), *aff'd*, 243 F. App'x 320 (9th Cir. 2007) ("[E]nd-stage renal disease" is "an objectively serious medical need.").  And while the Eighth Amendment does not apply to civil detainees (who cannot be subject to *any* punishment—cruel and unusual or not), their due process rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Bell*, 441 U.S. at 535 n.16 ("Due process requires that a pretrial detainee not be punished.  A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment.").

In evaluating claims of punitive civil confinement based on inadequate medical care, courts have held that "the Constitution does not require that detention facilities reduce the risk of harm to zero." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 212 (D.D.C. 2020) (quoting *Benavides v. Gartland*, Civ. A. No. 20-46, 2020 WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020).  Rather, due process requires officials to provide detainees "with 'reasonable safety' not perfect safety." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 64 (D.D.C. 2020) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)).

With these standards in mind, the Court considers whether the Government has acted to provide Petitioner with the reasonable level of safety required of someone in his medical condition. The Court concludes that the Government's plan to transport Petitioner thousands of miles on a multi-day flight with inadequate arrangements for dialysis or emergency treatment along the way violates due process.  The Government's plan puts Petitioner at serious risk of injury or death—a risk that becomes especially acute if his flight is delayed or forced to return to the United States. Such indifference to Petitioner's medical needs cannot be justified based on the Government's nonpunitive goal of executing his removal.

To begin, the record demonstrates that even a single missed dialysis session would place Petitioner at substantial risk of injury or death. Thus, Dr. Bansal, who reviewed Petitioner's approximately 2,000 pages of medical records, explains that an interruption of dialysis in patients, like Petitioner, with end-stage renal disease "results in rapid and progressive biochemical and clinical deterioration." Dkt. No. 86-2 at 5. Complications from missed dialysis may include the accumulation of lethal levels of potassium in the blood; progressive fluid accumulation leading to heart or respiratory failure and possible death; "uremia" (accumulation of toxins), which can "significantly increase risk of dying"; or "acidosis" (accumulation of acid), which can "lead to sudden death." *Id.* at 5–6. Missing even "a single dialysis treatment" can precipitate a patient's "clinical deterioration and death." *Id.* at 8.

Petitioner's condition has proven especially unstable since his detention began. He has required at least eight separate emergency room visits for chest pain, loss of consciousness, acute influenza, and uncontrolled high blood pressure, despite being on regular dialysis during all but the first of these incidents. Dkt. No. 86-2 ¶ 5; *id.* at 4–5. Most recently, Petitioner's doctors identified a potentially cancerous mass on his left kidney, which may require additional treatments such as surgery or chemotherapy. *Id.* at 5, 8. Dr. Bansal summarizes that a long-distance flight to Somalia "poses significant risks for patients" with end-stage renal disease generally, and that the risks are particularly "concern[ing]" in Petitioner's case, given his frequent need for emergency treatment and inability to access medical care while in transit. *Id.* at 8–9.

The record concerning ICE's travel arrangements underscores Dr. Bansal's concerns and raises significant doubt that ICE has made, or intends to make, adequate plans to ensure Petitioner's reasonable safety during any flight to Somalia. The Government insists that it "made a plan for [Petitioner's] removal that ensured he received dialysis on the route[.]" Dkt. No. 72 at 14. But the declaration and emails it cites show that ICE only planned to provide Petitioner dialysis

ORDER ON AMENDED HABEAS PETITION - 10

at its staging facilities *before* he departed the United States. *See* Dkt. No. 51 ¶¶ 8–9 (referencing dialysis plans at "staging facilit[ies]" in Florence, AZ, and Alexandria, LA), Dkt. No. 74-6 (same). The Government apparently does not intend to make arrangements for dialysis on any international layover, even though Petitioner's international travel is likely to span multiple days. Indeed, emails indicate that ICE initially contemplated an itinerary for Petitioner involving layovers in Puerto Rico, Senegal, and Kenya, with over 28 hours of international travel time (not including the final flight from Kenya to Somalia). Dkt. No. 87-4 at 2. And while the Government stated in March 2026 that its intended itinerary at the time involved just one stop in Ethiopia, it has provided no information about the anticipated travel time or the length of the layover in Ethiopia. Dkt. No. 51 ¶ 8. Nor has it suggested that it has made arrangements for dialysis or access to emergency treatment in Ethiopia if needed. And the Government's return provides no updated itinerary and practically no information at all about its plans to ensure Petitioner's safety, despite having undergone discovery on precisely this issue. *See* Dkt. No. 55 at 3 (compelling discovery into the "details o[f] any travel arrangements for Petitioner" on the basis that such details are relevant to whether "a flight to Somalia would imperil his life").

The Government also gives no indication that it intends to staff Petitioner's flight with a healthcare provider to monitor Petitioner's condition or provide treatment in case of emergency—again, despite participating in discovery centered on the adequacy of its travel arrangements. This omission is particularly telling in light of ICE's assurance in at least one other case that, when navigating a different medical situation, ICE had arranged to "carry a healthcare provider proficient in aviation medicine" on every removal flight. *See D.A.M.*, 474 F. Supp. 3d at 64

ORDER ON AMENDED HABEAS PETITION - 11

(describing COVID-19 precautions on removal flights).[4]  And while NWIPC's medical director, Dr. Wang, states that ICE's medical team, "[i]f notified" of a multiday flight, can prepare a detainee by providing additional dialysis sessions "the night prior to removal" (Dkt. No. 52 ¶ 8), ICE has not presented evidence that such arrangements were actually made in the weeks leading up to Petitioner's earlier planned removal.  *See* Dkt. No. 74-6 (emails coordinating dialysis at domestic staging facilities without mentioning extra sessions the night before removal).  Nor has the Government made any showing as to how, if at all, ICE intends to ensure Petitioner receives dialysis or emergency care in the event of delays or other contingencies not difficult to imagine during a long international trip.

Such contingencies pose a distinctly serious risk to Petitioner, as illustrated by the facts of *Ibrahim v. Acosta*, No. 17-CV-24574, 2018 WL 582520 (S.D. Fla. Jan. 26, 2018).  In that case, ICE attempted to remove several individuals to Somalia via Senegal (a route similar to that initially envisioned by ICE here), but their flight was "grounded at the Dakar airport for approximately 23 hours."[5]  *Id.* at *3.  "For unclear reasons, the flight could not continue to Somalia and was forced to return to the United States" during which time the petitioners "remained bound and shackled for the entirety of" what became a "48-hour trip[.]"  *Id.*  Given Petitioner's condition, a similar experience would likely place him on the brink of medical crisis, if not beyond.  Failing to take steps to mitigate such foreseeable risk—such as arranging for dialysis at international layovers or

---

[4] Indeed, the specificity of ICE's assurances in *D.A.M.*—in which the agency submitted multiple "sworn declarations" describing specific safety measures, including "verbal screenings and temperature checks" at "each leg of the trip"; "dedicated charter flights and ground transportation for all trips"; in-flight healthcare providers; distribution of personal protective equipment; and segregation of individuals for physical distancing—underscores the inadequacy of its showing here.  *D.A.M.*, 474 F. Supp. 3d at 64.  By contrast, Deportation Officer Karl Douglas offers the generic statements that "DHS will ensure that Petitioner's medical conditions are taken into account"; "account[] for Petitioner's dialysis"; and "ensure that Petitioner receives adequate medical care during his removal to Somalia."  Dkt. No. 73 ¶ 4.

[5] The parties disputed whether the flight was grounded for mechanical reasons or crew rest issues.  *Ibrahim*, 2018 WL 582520, at *3.

ORDER ON AMENDED HABEAS PETITION - 12

staffing Petitioner's flight with a healthcare provider—does not meet the "reasonable safety" standard when a medically fragile detainee has a history of needing emergency care and requires continuous, life-preserving treatment.

The Government raises several objections to Petitioner's punitive treatment claim, but none are persuasive. First, the Government contends that Petitioner's claims "related to inadequate medical care in Somalia are outside" this Court's jurisdiction under 28 U.S.C. § 1252(g). Dkt. No. 72 at 13. But the Government does not dispute that his claims challenging the *manner* by which the Government intends to remove him—the conditions of his removal flight—are within the Court's jurisdiction.[6] Petitioner's "challenge to the physical manner of [his] deportation does not implicate the agency's discretionary decision to execute [his] removal order[]" and thus does not trigger § 1252(g)'s jurisdictional bar. *D.A.M.*, 474 F. Supp. 3d at 60 (holding § 1252(g) did not bar challenge to adequacy of COVID-19 protocol on removal flights); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (construing § 1252(g) "narrow[ly]" to apply "only" to the discretionary "decision or action to commence proceedings, adjudicate cases, or execute removal order" (citation modified)); *Bhandari v. Bondi*, No. C25-2747-KKE, 2026 WL 369403, at *6 (W.D. Wash. Feb. 10, 2026) (distinguishing "challenges to ICE's discretion to execute a removal order, which are barred" from "challenges to the manner in which ICE executes the removal order, which are not") (quoting *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 152 (W.D.N.Y. 2025)).

Second, the Government briefly argues that Petitioner's punitive confinement claim is a challenge to the "conditions of [his] confinement" that may not properly be brought in habeas.

---

[6] The Court does not reach Petitioner's claims concerning access to treatment in Somalia as Petitioner is entitled to relief based on his claim that the manner of his anticipated removal violates due process and thus his detention no longer serves a non-punitive purpose, as well as the other grounds set forth in this order.

ORDER ON AMENDED HABEAS PETITION - 13

Dkt. No. 72 at 13. But as courts in this District and elsewhere have held, "[w]hether civil detention is unconstitutionally punitive … is a question that clearly sounds in habeas because it goes directly to the legality of the detention itself." *Sorio v. Hermosillo*, No. 2:25-CV-02492-TL, 2026 WL 413530, at *8 (W.D. Wash. Feb. 13, 2026); *Doe v. Becerra*, 723 F. Supp. 3d 688, 691 n.1 (N.D. Cal. 2024) (rejecting similar argument that punitive-detention claim did not sound in habeas). Here, Petitioner claims that his detention has become punitive as its only asserted purpose is to ensure his presence for an unconstitutionally perilous removal flight, and that he is thus "in custody in violation of the Constitution … of the United States" and entitled to release. 28 U.S.C. § 2241(c)(3). Petitioner's claim properly sounds in habeas.

Finally, the Government contends that Petitioner's detention and manner of intended removal is not punitive because it "is reasonably related to legitimate governmental objectives"— namely, executing his removal order. Dkt. No. 72 at 13. But while there is no question that executing removal orders is a legitimate goal (*Landon v. Plasencia*, 459 U.S. 21, 34 (1982) (recognizing a "weighty" "interest in efficient administration of the immigration laws")), doing so by harsh or indifferent means while ignoring humane alternatives violates the Constitution. Thus, as explained in *Bell*, "loading a [pretrial] detainee with chains and shackles and throwing him in a dungeon" would violate due process despite, in some sense, serving the valid goal of ensuring his presence at trial. *Bell*, 441 U.S. at 539 n.20 (explaining that the government strays into punishment by employing "conditions so harsh" when "less harsh methods" are available). Similarly, the Government's plan to roll the dice with Petitioner's health by sending him on a multi-day flight with no arrangements for dialysis (after he leaves staging) or access to treatment in case of delay or emergency crosses the line from pursuing a valid interest into punishment.

The appropriate remedy in this case is release. District courts "enjoy 'broad' discretion in fashioning remedies for habeas relief." *Johnson v. Uribe*, 700 F.3d 413, 425 (9th Cir. 2012)

ORDER ON AMENDED HABEAS PETITION - 14

(quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)).  Petitioner has now been detained for a year, during which time his medical condition has deteriorated, he has been diagnosed with end-stage renal disease, and he has come to require continuous, life-preserving therapy.  The Government has no plans to remove Petitioner by constitutionally adequate means (and, at this point, no unexpired travel document) and has never argued that Petitioner poses a flight risk or danger to the community.  Accordingly, his continued detention no longer serves the legitimate, non-punitive purpose of ensuring his presence for removal.  *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021) (holding that civil detention becomes punitive when "there is no regulatory purpose that can rationally be assigned to the detention").

The Court will therefore grant Petitioner's habeas petition and order his release from detention.

**C.    The Government's Failure to Follow Its Regulations or Provide any Pre-Detention Process Before Re-Detaining Petitioner Violated His Right to Due Process.**

Petitioner is also entitled to release because, when ICE arrested him, it failed to follow its own regulations intended to ensure noncitizens receive adequate notice and an opportunity to be heard with respect to the reasons for their re-detention.  Moreover, its failure to provide *any* pre-deprivation process before forcibly removing him from his home and revoking his OSUP independently violated his due process rights.  The Court will therefore grant Petitioner's habeas petition on these additional grounds as well.

1.  ICE failed to follow it regulations governing OSUP revocations.

Noncitizens subject to a removal order, such as Petitioner, may be released from detention under 8 C.F.R. § 241.4 or 8 C.F.R. § 241.13.  These regulations also describe the procedure by which ICE may revoke release if the noncitizen violates a condition of release, if there is a change in circumstances that makes it significantly likely the noncitizen will be removed "in the

ORDER ON AMENDED HABEAS PETITION - 15

reasonably foreseeable future," or if revocation is in the public interest. 8 C.F.R. §§ 241.4(l), 241.13(i).

ICE's regulations provide that "[u]pon revocation" of an OSUP, a noncitizen "will be notified of the reasons for revocation of his or her release" and will be afforded an initial informal interview "promptly after his or her return to … custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. §§ 241.4(l)(1), 241.13(i). During that interview, the noncitizen "may submit any evidence or information that he or she believes shows there is no significant likelihood he or she will be removed in the reasonably foreseeable future, or that he or she has not violated the order of supervision." 8 C.F.R. § 241.13(i).

Here, Petitioner was not "promptly" given an informal interview. *Id.* Instead, ICE interviewed him "months" after his arrest—at which time Petitioner states he was not given "any opportunity to object to the government's evidence or provide [his] own evidence." Dkt. No. 86-1 ¶¶ 3–4. The Government does not deny that 8 C.F.R. §§ 241.4(l) and 241.13(i) apply to Petitioner and acknowledges that it possesses no evidence indicating Petitioner received the process required by its regulations. Dkt. No. 72 at 10. Instead, the Government argued in its return that Petitioner had not, at that time, provided evidence establishing the Government's failure to comply with its regulations. *Id.* In fact, Petitioner's verified petition, which may be treated as an affidavit, stated as much.[7] Dkt. No. 35 at 28. And, in any event, Petitioner submitted a declaration with his traverse

___

[7] "A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc). Habeas petitions must be "verified by the person for whose relief it is intended or by someone acting in his behalf." 28 U.S.C. § 2242. The Local Rules of this district permit another person to verify a habeas petition on behalf of someone in custody so long as that person "set[s] forth therein the reason why it is not made and verified by the party in custody, and shall state he or she knows the facts set forth therein, or if upon information and belief, the sources of his or her information shall be stated." Local Rules W.D. Wash. LCR 100(e). Here, Petitioner's counsel explained the reasons why Petitioner did not personally verify the petition and stated that she knew the facts asserted in the petition or alleged them based on information obtained from the Government or Petitioner. Dkt. No. 35 at 34; *see Singh v. Bondi*, No. C26-0477-KKE, 2026 WL 586230, at *2 (W.D. Wash. Mar. 2, 2026) (considering petition properly verified when Petitioner's counsel complied with Local Civil Rule 100(e)).

ORDER ON AMENDED HABEAS PETITION - 16

confirming the Government's failure to follow its regulations. Dkt. No. 86-1 ¶¶ 3–4. The record thus supports that the Government failed to promptly provide Petitioner an informal interview or allow him to challenge the evidence supporting his re-detention or submit his own evidence.

Accordingly, the Court concludes that Petitioner's re-detention violated ICE's regulations and thus Petitioner's constitutional right to due process. *See Constantinovici v. Bondi*, 806 F. Supp. 3d 1155, 1164 (S.D. Cal. 2025) ("It is well-established that government agencies are required to follow their own regulations. … '[W]here ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered.'" (quoting *Rokhfirooz v. Larose*, 804 F. Supp. 3d 1095, 1099 (S.D. Cal. 2025))). The appropriate remedy for the Government's violation is release, "returning [Petitioner] to the status quo before his release was improperly revoked." *Yang v. Scott*, No. 2:26-CV-00469-JNW, 2026 WL 632661, at *5 (W.D. Wash. Mar. 6, 2026) (collecting cases); *see also Ceesay*, 781 F. Supp. 3d at 166 ("[B]ecause ICE did not follow its own regulations in deciding to re-detain [petitioner], his due process rights were violated and he is entitled to release.").

2. ICE's failure to provide pre-deprivation notice and an opportunity to be heard violated due process.

Alternatively, even setting aside ICE's regulatory violation, its failure to give Petitioner pre-deprivation notice and an opportunity to be heard before forcibly removing him from his home and revoking his OSUP fails the test set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1320–24 (W.D. Wash. 2025) (finding detention of noncitizen without a pre-deprivation hearing violated due process under *Mathews*); *Ledesma Gonzalez v. Bostock*, 808 F. Supp. 3d 1189, 1202–03 (W.D. Wash. 2025) (applying *E.A. T.-B.*'s analysis to an OSUP revocation). Petitioner's decades of living in the community gives him a strong liberty interest in not being detained. *See Saelee v. Bondi*, No. 2:25-CV-02677-TLF, 2026

ORDER ON AMENDED HABEAS PETITION - 17

WL 221513, at *5 (W.D. Wash. Jan. 28, 2026) (eleven years of release on an OSUP "only strengthen[ed]" petitioner's liberty interest). The risk of erroneous deprivation is high when the Government forcibly enters a home, detains an individual, and provides only a belated interview months later with no opportunity to contest the detention or submit evidence. The Government suggests Petitioner's criminal record somehow diminishes the risk of erroneous deprivation. Dkt. No. 72 at 9. But his most recent conviction occurred over eight years before his arrest—belying the suggested connection—and, in any event, the Government never cited his conviction as a ground for revoking his OSUP. Dkt. No. 74-1 (citing only likelihood of removal); *see Llanes Tellez v. Bondi*, 826 F. Supp. 3d 1141, 1153–54 (N.D. Cal. 2025) (finding risk of erroneous deprivation high where ICE waited eight months to re-detain noncitizen after a conviction for conduct that occurred two years earlier). And, as numerous courts have reiterated, "the Government's interest in re-detaining non-citizens previously released without a hearing is low." *Ledesma Gonzalez*, 808 F. Supp. 3d at 1203 (quoting *E.A. T.-B.*, 795 F. Supp. 3d at 1324).

As all three *Mathews* factors support finding that Petitioner's re-detention violated procedural due process, this forms an additional basis for his release.

**D.      The Court Will Grant In Part Petitioner's Request for Injunctive Relief.**

Petitioner also seeks prospective injunctive relief adjacent to his habeas petition. In particular, he seeks protection in the event ICE attempts to re-detain him or remove him to a country other than Somalia. Dkt. No. 35 at 33. The Court will grant his request in part.

1.    <u>Petitioner is entitled to notice and an opportunity to be heard before any re-detention.</u>

Petitioner requests an order enjoining the Government from re-detaining him without first providing notice and an opportunity to be heard at a hearing before a neutral decisionmaker as to the reasons for his re-detention. Dkt. No. 35 at 33. Under the particular circumstances of this

ORDER ON AMENDED HABEAS PETITION - 18

case, the Court finds that such injunctive relief is warranted to effectuate this order and prevent further violations of Petitioner's due process rights.

Petitioner has shown that he is likely to be re-detained in the future—indeed, the Government has twice procured a travel document in Petitioner's name. And ICE has already failed once before to follow its own regulations in re-detaining Petitioner. Petitioner's detention without adequate process has caused irreparable injury—his unlawful detention—and any future attempt to remove him without adequate arrangements in place for his dialysis and emergency medical care would again place him at risk of injury or death. Petitioner has no adequate remedy against the Government to compensate for these harms. And the balance of hardships favors Petitioner, who has lived in the United States since he was fifteen and requires continuous medical treatment to survive. Finally, the public interest is unquestionably served when the Government adheres to the constitution and its own regulations.

Under similar circumstances, courts in this District have held that, prior to any re-detention, due process requires that a noncitizen receive notice of the reasons for the re-detention and an opportunity to contest those reasons in a hearing before an IJ. *See Yang*, 2026 WL 632661, at *5; *Acosta-Ginori v. Bondi*, No. 2:25-CV-02649-RAJ, 2026 WL 221509, at *6 (W.D. Wash. Jan. 28, 2026) (citing cases). Accordingly, the Court will prohibit the Government from re-detaining Petitioner without notice and a meaningful opportunity to be heard before a neutral decisionmaker. If the justification for detention is that changed circumstances have made Petitioner's removal reasonably foreseeable, the Government must notify Petitioner of the plans it has made to adequately provide for his constitutionally required medical care during removal and permit him to challenge the sufficiency of those arrangements by presenting relevant evidence to the IJ.

ORDER ON AMENDED HABEAS PETITION - 19

2.  Notice and an opportunity to be heard must accompany any third country removal.

Petitioner also seeks an order limiting the Government's ability to remove him to a country other than Somalia—i.e., a third country.  When the Government cannot remove a noncitizen to the country specified in their removal order, it may attempt to remove that person to a third country. 8 U.S.C. § 1231(b).  But in doing so, it must comply both with the Immigration and Nationality Act ("INA") and the Due Process Clause.  *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1019 (W.D. Wash. 2019); *Kumar v. Wamsley*, C25-2055-KKE, 2025 WL 3204724, at *2 (W.D. Wash. Nov. 17, 2025) ("[T]hird country removals are subject to the same mandatory protections that exist in removal proceedings.").  To comply with due process, the Government must provide sufficient notice and a meaningful opportunity for the noncitizen to present any claim of fear of persecution or harm upon removal to a designated third country.  *Aden*, 409 F. Supp. 3d at 1019.  The INA prohibits ICE from removing a noncitizen to any country where their "life or freedom would be threatened … because of [their] race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1231(b)(3)(A).  The Government must "make a determination regarding a noncitizen's claim of fear before deporting him."  *Aden*, 409 F. Supp. 3d at 1010; 8 U.S.C. § 1231(b)(3)(A).  Multiple courts in this district have held that, if a noncitizen claims fear of removal to a designated third country, the Government must allow them to pursue withholding of removal through reopened removal proceedings before an IJ.  *Aden*, 409 F. Supp. 3d at 1011; *Baltodano v. Bondi*, No. C25-1958RSL, 2025 WL 2987766, at *3–4 (W.D. Wash. Oct. 23, 2025); *Nguyen v. Scott*, 796 F. Supp. 3d 703, 739 (W.D. Wash. 2025).

Against this legal backdrop, Petitioner requests an order requiring notice of any third-country removal and the opportunity to respond and contest that removal in reopened removal proceedings if he has a fear of persecution or torture in the selected country.  Dkt. No. 35 at 33.  In support, Petitioner cites a July 9, 2025 ICE policy memo, which allows for deportation of

individuals to third countries "without any procedures for notice or an opportunity to be heard." *Id.* at 24. The Government does not dispute that its policy permits, in some instances, removal to a third country without notice and an opportunity to be heard, but argues that Petitioner's challenge is not ripe because ICE has not indicated it will remove him to any country but Somalia. *See* Dkt. No. 72 at 12, 17. The problem with Respondents' argument is that, without a requirement that ICE notify Petitioner of its intent to remove him to a third country, Petitioner could be put on a plane without being told where he is going and would never have the chance to express a reasonable fear of persecution or torture or seek judicial intervention. Petitioner's fear of such a circumstance is not speculative, as such removals have been well documented by the courts and the press. *See e.g.*, *Nguyen*, 796 F. Supp. 3d at 733–74 (collecting cases); *Elshourbagy v. Bondi*, No. 2:25-CV-02432-TL, 817 F. Supp. 3d 1102, 1116 (W.D. Wash. 2025) (discussing Sarah Stillman, *Disappeared to a Foreign Prison*, The New Yorker (Dec. 12, 2025)).

As this Court and numerous others have consistently held, the procedures set forth in the July 9, 2025 ICE policy memo fall well short of what the *Aden* court and others in this district have found due process and the INA require. Thus, the Court will grant Petitioner's request for relief. Should the Government take steps to remove Petitioner to a country other than Somalia, it must provide Petitioner with written notice of its intent to do so and a meaningful opportunity to respond in reopened removal proceedings before an IJ under 8 U.S.C. § 1231(b)(3). *Nguyen,* 796 F. Supp. 3d at 727. ("'[B]oth the due process clause and the governing statute place the burden on the government—regardless of whether the country of deportation is designated during or after the removal hearing—to provide a meaningful opportunity to be heard on asylum and withholding claims.' This cannot be satisfied by simply allowing the noncitizen to file a motion to reopen their removal proceedings; rather, the removal proceedings must be reopened so that a hearing can be held.") (quoting *Aden*, 409 F.Supp.3d at 1010–11)).

3.  Petitioner's request to enjoin third-country removal is denied without prejudice.

Finally, Petitioner seeks to enjoin Respondents from removing him "to any third country" on the basis that ICE's third-country removal policy is punitive, in violation of his Fifth and Eighth Amendment rights.  Dkt. No. 35 at 33.  As noted above, numerous courts, including this one, have held the Government's third-country removal policy is unconstitutional. *See, e.g.*, *Kumar*, 2025 WL 3204724, at *6; *Nguyen*, 796 F. Supp. 3d at 735 (collecting cases).  The Government does not address this growing body of legal authority, nor does it dispute the underlying factual allegations supporting it.  Instead, the Government again argues that Petitioner's request to enjoin third-country removal is speculative and premature, as ICE seeks only to remove Petitioner to Somalia. Dkt. No. 72 at 12.

The Court agrees with the Government that the present record does not support such a broad injunction.  Rather, as detailed above, this order requires the Government to provide Petitioner with due process in effectuating any future third-country removal.  As such, on this record, it is not clear to the Court that additional injunctive relief is necessary to prevent irreparable injury at this time.  Nothing in this order prevents Petitioner from pursuing additional relief if warranted by future events.  *See Coke v. Bondi*, No. C26-71-MLP, 2026 WL 221514, at *4 (W.D. Wash. Jan. 28, 2026).

### III.  CONCLUSION

The Court GRANTS Petitioner's habeas petition.  The Court further ORDERS:

1.    The Government is ORDERED to release Petitioner from custody under the conditions of his most recent order of supervision no later than **July 25, 2026.**

2.    **No later than July 27, 2026,** the Government must provide the Court with a declaration confirming that Petitioner has been released from custody.

ORDER ON AMENDED HABEAS PETITION - 22

3.      The Government may not re-detain Petitioner unless (a) the Government provides Petitioner written notice of the basis for the proposed re-detention in advance and (b) Petitioner is afforded a pre-detention hearing before an immigration judge in which he may contest the reasons for his re-detention.

4.      If the Government pursues removal of Petitioner to a third country, it must provide him with written notice of its intent to do so and a meaningful opportunity to respond in reopened removal proceedings before an immigration judge under 8 U.S.C. § 1231(b)(3).

5.      Any fee petition should be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 24th day of July, 2026.

Kymberly K. Evanson
United States District Judge

ORDER ON AMENDED HABEAS PETITION - 23